**Charlie YOUNG, Jr., Petitioner-Appellee, Cross-Appellant,**

**v.**

**Walter ZANT, Warden, Georgia Diagnostic & Classification Center, Respondent-Appellant, Cross-Appellee.**

**No. 81–7123.**

United States Court of Appeals, Eleventh Circuit.

May 14, 1982.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Laughlin McDonald, Atlanta, Ga., Randolph Z. Volkell, Hollis, N.Y., for petitioner-appellee, cross-appellant.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

On February 19, 1976, the petitioner, Charlie Young, Jr., was convicted of malice murder, armed robbery and robbery by intimidation by a jury in the Superior Court of Greene County, Georgia. The jury, following a presentencing hearing, recommended that Young be sentenced to death on the malice murder charge, and the court sentenced Young accordingly. The court also sentenced Young to life imprisonment on the armed robbery charge and to twenty years for robbery by intimidation.

■ After exhausting his state remedies,[1] Young commenced this habeas corpus proceeding in the district court, contending that his convictions were invalid because he was denied his sixth and fourteenth amendment right to effective assistance of counsel. The district court found that Young had been denied effective assistance of counsel during the presentencing phase of

---

1. The Supreme Court of Georgia affirmed Young's convictions and the death sentence. *Young v. Georgia*, 237 Ga. 852, 230 S.E.2d 287 (1976). Young then filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia. After conducting an evidentiary hearing, the court denied the petition. The Supreme Court of Georgia affirmed, and the Supreme Court of the United States denied certiorari. *Young v. Ricketts*, 242 Ga. 559, 250 S.E.2d 404 (1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (1979).

his bifurcated trial and set aside the death sentence.[2] *Young v. Zant*, 506 F.Supp. 274 (M.D.Ga.1980). The court also determined that the evidence the jury was permitted to consider in deliberating the death penalty was insufficient to prove that the homicide was committed under either of the two aggravating circumstances alleged by the State, namely, that Young committed the murder during the course of an armed robbery or for the purpose of obtaining money,[3] and cited this failure of proof as an alternative ground for setting aside the death sentence.[4] As to the guilt phase of Young's trial, the court found no constitutional infirmity and therefore upheld each of Young's convictions. *Id.*

Both Young and the State of Georgia appeal. Young contends that his trial attorney, Reuben A. Garland, was unaware of the existence or purpose of the bifurcated trial procedure in Georgia death penalty cases whereby the issues of guilt and punishment are considered by the jury in separate proceedings;[5] Garland believed that the jury would, in accordance with the former Georgia procedure, consider guilt and punishment together. According to Young this complete lack of understanding of how his case was to be tried caused Garland to adopt a trial strategy of conceding Young's guilt and pleading for mercy during the guilt phase of the proceeding. Had Garland known that the jury would not be considering whether to recommend mercy as it deliberated the issue of guilt, Young contends, Garland would not have conceded that issue to the State. Instead, he would have argued that Young was guilty not of malice murder but of some lesser included offense, such as voluntary manslaughter, and thus would have removed altogether the threat of the death penalty from the case. Garland also would have argued that the evidence did not support the charges of armed robbery or robbery by intimidation.

The State concedes, as it must on this record, that Garland was unaware of Georgia's bifurcated proceeding in death-penalty cases but contends that he nevertheless provided Young with adequate representation at both the guilt and presentencing phases of the trial. The State also submits that the evidence proved the two aggravating circumstances alleged in Young's indictment and that the sentence of death was therefore lawfully imposed. The State asks that we reverse the district court and deny the writ.

An examination of the record of the trial makes it plain that Garland did not accord

2. The district court based its conclusion on the evidence adduced at the hearing conducted by the state trial court on Young's habeas petition. Since effective assistance of counsel is a mixed question of law and fact, the district court was not bound by the state court's determination that Young had received adequate representation. *See Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1981); *Baty v. Balkcom*, 661 F.2d 391, 394 n.7 (5th Cir. 1981).

3. The district court concluded that the undisputed evidence showed that Young's victim, Reuben H. Flynt, was completely incapacitated before Young formed the intent to rob him. Thus, the court reasoned, the State had failed to prove that any of the essential elements of armed robbery, the taking of property from a person "by use of an offensive weapon," Ga. Code Ann. § 26–1902, occurred prior to the assault; nor had it shown that Young's purpose in assaulting Flynt was to obtain money.

Curiously, the district court did not discuss the legal effect of Flynt's incapacity, and therefore Young's taking *without* "use of an offen-

sive weapon," on the validity of Young's conviction for armed robbery. This might have been due to petitioner's failure to make the claim that the State's evidence was insufficient under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

4. At least one aggravating circumstance must be established beyond a reasonable doubt to authorize the imposition of the death penalty under Georgia law, Ga.Code Ann. § 27–2534.-1(c).

5. Pursuant to Ga.Code Ann. § 27–2503(b), the jury first considers only the question of guilt or innocence. If it returns a guilty verdict and the State seeks the death penalty, the trial is resumed. The jury then considers evidence of aggravating and mitigating circumstances and the arguments of counsel. If the jury finds at least one aggravating circumstance beyond a reasonable doubt, it must decide whether to recommend the death sentence. *See* Ga.Code Ann. § 27–2534.1(c).

Young even a modicum of professional assistance at any time. The petitioner's convictions are consequently invalid, and we direct the district court to issue the writ of habeas corpus.

## I.

### A.

The State's murder and armed robbery cases against Charlie Young were built on a confession he gave to FBI agents following his arrest and on the testimony of expert witnesses who corroborated his confession with the results of the ballistics, fingerprint and blood tests they conducted. There were no eyewitnesses other than Charlie Young. The State's case of robbery by intimidation, on the other hand, was established principally by persons who saw the offense committed.

According to the confession, on December 15, 1975, Charlie Young, accompanied by his nephew Derwin Young, drove from Atlanta to Union Point, Georgia, hoping to meet with Reuben H. Flynt, vice president of Farmers Bank in Union Point. Flynt had made two bank loans to Charlie Young, and Young had fallen behind in his payments. He feared that the bank would ask his grandmother, who had co-signed his notes, to assume his obligations. He wanted Flynt to set up a new payment plan that would not involve his grandmother.

Charlie and Derwin Young arrived in Union Point during the lunch hour. They drove immediately to Farmers Bank. When Charlie Young noticed that Flynt's automobile was not there, they drove on to Flynt's house, back to the bank and finally back to Flynt's house before Young spotted Flynt's car. They parked in Flynt's driveway, and Charlie Young went to the front door of Flynt's house and rang the bell. Flynt met Young at the door and told him to return to the bank, where Flynt would meet him in thirty minutes. Young was dissatisfied with this arrangement, so he went to his car, got his wife's .22 caliber pistol, returned to the house, walked in and began discussing the two loans with Flynt. During the course of the discussion, Young telephoned his grandmother's house but was unable to reach her. The conversation resumed and led to a heated argument. The two men struggled. Young hit Flynt several times with the butt of the gun and shot him four times at close range. As Flynt lay dying, Young ripped the telephone from the wall and removed Flynt's billfold from his rear pocket.

At this point, Young thought of a way of getting money from Farmers Bank. He returned to his car, and he and Derwin Young drove to the bank. Following Charlie's instructions, Derwin entered the bank, handed Flynt's wallet to a teller and said, "The man that gave me this billfold said for you to give me $60,000 or he will kill Reuben Flynt in fifteen minutes." The teller immediately notified the president of the bank, John Stewart, who called the police and the FBI and then instructed the teller to give Derwin Young $10,000. As Derwin left the bank with the money he was arrested by police officers responding to Stewart's call.

When Derwin Young did not return to the car, Charlie Young fled to his grandmother's house. The police followed him there, arrested him and took him to the Greene County Courthouse. At the courthouse, Charlie Young was questioned and gave the confession that made the State's case. He also consented to a search of his automobile.[6] The search yielded the .22 caliber pistol Young used to kill Reuben Flynt and Flynt's checkbook covered with blood.

In January 1976, a Greene County grand jury indicted Charlie Young, charging him with the malice murder, Ga.Code Ann. § 26–1101(a), and armed robbery of Reuben H. Flynt, Ga.Code Ann. § 26–1902, and the robbery of John Stewart, the Farmers Bank president, by intimidation, Ga.Code Ann.

---

**6.** Neither the admissibility of Young's statement nor the propriety of the search is challenged in this appeal.

§ 26–1901. The prosecutor gave timely notice that if Young were convicted of malice murder, the State would establish two aggravating circumstances in the presentencing hearing: that the defendant committed the murder during the commission of another capital felony, armed robbery, Ga.Code Ann. § 27–2534.1(b)(2), and that he committed it for the purpose of obtaining money, Ga.Code Ann. § 27–2534.1(b)(4). The prosecutor would ask the jury to recommend the death penalty if it found either of these aggravating circumstances beyond a reasonable doubt. At his arraignment Young entered a plea of not guilty.

Charlie Young's family retained Reuben A. Garland to represent him at trial. Garland, a member of the Georgia bar since 1920, was assisted by Frank Petrella, a young associate of an Atlanta law firm. The firm loaned Petrella to Garland strictly for Young's trial; Petrella was not retained by Young's family. Garland relegated Petrella to a minor role in the case, making it plain at the outset that Petrella was to speak only when Garland addressed him.

### B.

The State's burden was clear from the start. To obtain a conviction for malice murder the prosecution was required to prove that the accused deliberately intended to kill Reuben H. Flynt under circumstances devoid of considerable provocation or showing an abandoned and malignant heart. Ga.Code Ann. § 26–1101(a). To obtain a conviction for armed robbery the prosecution was required to prove that with intent to commit theft of a person, the accused took Flynt's billfold by using an offensive weapon. Ga.Code Ann. § 26–1902(a). To establish robbery by intimidation the prosecution was required to prove that, under the accused's direction, Derwin Young took money from John Stewart by

placing him in fear of Flynt's safety. Ga. Code Ann. § 26–1901.

Garland had two options in preparing Young's defense; he could put the State to the proof or he could seek to avoid the State's case with an affirmative defense. Garland opted for the latter strategy; he would establish that his client was not guilty by reason of insanity.[7] Garland could not support this defense, however. Charlie Young's confession gave no indication that Young was insane when he assaulted Flynt, and Garland did not uncover any evidence that pointed to insanity. Indeed Garland did not even have his client examined by a psychiatrist to determine his mental capacity at the time of the alleged offenses. Garland did enter a special plea of insanity prior to trial, but he entered it under the erroneous belief that the plea raised the question of whether Young was insane when the offenses were committed.[8] A special plea of insanity, under Georgia law, actually questions the defendant's competence to stand trial, Ga.Code Ann. § 27–1502; it has nothing whatever to do with the affirmative defense of insanity, which is raised by a general plea of insanity. A court ordered psychiatric examination demonstrated that the defendant was competent to stand trial, and Garland withdrew his special plea of insanity.[9] Garland thus proceeded to trial on an insanity defense he could not possibly establish.

The trial began on February 17, 1976. Jury selection took approximately one and one-half days, and the State began its case on the afternoon of the 18th with the prosecutor calling twelve witnesses. Garland failed to cross-examine four of these witnesses and his questioning of all but one of the other eight was cursory and superficial. At the end of the afternoon, the court announced that it would run a night session and adjourned for dinner. Garland subse-

---

**7.** Frank Petrella testified in the state habeas corpus proceedings that, from the beginning, Garland considered insanity the only plausible defense.

**8.** When he testified in the state habeas corpus proceeding, Garland did not know the differ-

ence between a general and a special plea of insanity under Georgia law.

**9.** The psychiatrist found that Young understood the charges lodged against him and was competent to assist counsel in his defense.

quently met the trial judge on the courthouse steps and told him that he would not be present when the trial resumed that evening. He did not ask the court to cancel the night session; nor did he tell his client that he would be absent.

Petrella filled in for Garland that evening, and though he was not prepared to cross-examine the six witnesses the State called to the stand, all experts from the Georgia Crime Lab, he did so. Garland reappeared the next morning, and the State put on its last five witnesses. He briefly cross-examined three of them. The State then rested, having established the facts we have related. The defense had no evidence to present, so it also rested. Garland made no motion for a directed verdict of acquittal. The court then held a brief charge conference. Garland requested two instructions, a charge on insanity and a charge regarding the right of the defendant to remain silent. Despite the absence of evidence in the record to support a finding of insanity, the court included both requested charges in its final instructions to the jury. No mention of the death penalty was made either during the charge conference or in the court's proposed instructions. Under Georgia's bifurcated procedure in death-penalty cases, of course, whether the death penalty or mercy should be recommended by the jury was not germane to the determination of guilt or innocence.

Inexplicably, Garland somehow convinced himself that the jury would be instructed to make a recommendation on the death penalty as it deliberated the question of guilt on the malice murder charge. Because it was beyond dispute that his client had killed Reuben Flynt and might be found guilty of malice murder, Garland focused his entire argument to the jury on the punishment it should mete out. He abandoned any notion that the jury might be persuaded to find his client guilty of the lesser crime of manslaughter on the theory that Flynt's homicide was committed during a heated argument. He also abandoned, for lack of proof, his defense that his client was insane at the time of the offense. As his argument unfolded, Garland conceded that his client was guilty of malice murder and begged for mercy. He assured the jury that Young would never be returned to society with these words: "Under the evidence of this case, I only ask you for life ... under the evidence of this case he will never get a pardon." [10] Although the trial judge admonished Garland to save his argument on punishment for the sentencing phase of the trial, if one became necessary, Garland failed to heed this admonition and continued to plead for mercy.

With both the prosecution and the defense advising it that Charlie Young had committed malice murder, the jury promptly found Young guilty of that offense and armed robbery and robbery by intimidation as well. The court then declared a brief recess so the parties could prepare for the presentencing hearing on the death penalty issue. By this time it was clear to the trial judge that although Garland had more than a half century of experience in the trial of criminal cases, Garland did not comprehend the purpose of the presentencing hearing; so the judge instructed Petrella to explain the procedure to Garland. Petrella advised Garland that this was the time for the defense to introduce mitigating evidence that might lead the jury to recommend no death sentence and he advised Garland that Young could be put on the stand to explain his actions even though he had not testified in the earlier proceeding. As the district court noted, Charlie Young was college-educated and articulate, he had never been in trouble with the law, and he had received a favorable employment recommendation from the Sheriff of Greene County. This favorable background might have prompted the jury to recommend mercy, but Garland did not call Young to the stand or introduce any evidence.

---

**10.** Only a portion of Garland's closing argument has been transcribed. However, we think it is clear that the quoted remark was an admission by Garland in the guilt phase of trial that his client was guilty. *See Young v. Zant*, 506 F.Supp. at 279.

We do not have the transcript of the lawyers' final summations to the jury. We assume that Garland attempted to rebut the State's claim that the malice murder had been committed in the course of another capital felony or for the purpose of obtaining money. We also assume that Garland concluded, as he did when he addressed the jury in the guilt phase of the trial, with a naked plea for mercy. We do know that the jury rejected his plea, for it recommended that Young be sentenced to death.

## II.

■ A criminal defendant has a constitutional right to competent counsel; and we judge the competence of appointed and retained counsel by the same standard. *Cuyler v. Sullivan*, 446 U.S. 335, 344–45, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). A criminal defendant is not entitled to error-free counsel. *Mylar v. Alabama*, 671 F.2d 1299, 1300 (11th Cir. 1982). Nor can he complain of representation that might be judged ineffective only by the benefit of hindsight. *Clark v. Blackburn*, 619 F.2d 431, 433 (5th Cir. 1980).[11] However, if counsel's conduct at trial, viewed in the context of the totality of circumstances, falls below the range of competency generally demanded of attorneys in criminal cases, a criminal conviction obtained through such a trial unconstitutionally deprives the defendant of his liberty. *See Cuyler v. Sullivan*, 446 U.S. at 344, 100 S.Ct. at 1715–1716; *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); *Mylar v. Alabama*, 671 F.2d at 1301; *Baty v. Balkom*, 661 F.2d 391, 394 (5th Cir. 1981).

■ Whether defense counsel has rendered adequate assistance is a mixed question of fact and law that requires the application of legal principles to the historical facts of the case. *Cuyler v. Sullivan*, 446 U.S. at 341–42, 100 S.Ct. at 1715; *see Baty v. Balkcom*, 661 F.2d at 394 n.7. Absent a clearly erroneous determination, we defer to the district court's findings on such primary facts as what the attorney did or did not do during the course of the trial. However, we will apply our own judgment to the question of whether that conduct constituted ineffective assistance.

■ Where defense counsel is so ill prepared that he fails to understand his client's factual claims or the legal significance of those claims or that he fails to understand the basic procedural requirements applicable in court, we have held that counsel fails to provide service within the range of competency expected of members of the criminal defense bar. *See Baty v. Balkcom*, 661 F.2d at 394–95; *Kemp v. Leggett*, 635 F.2d 453 (5th Cir. 1981); *Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978). Although the degree of preparation adequate to defend a particular client is not always easy to discern, we find no difficulty on the facts of this case. We wholeheartedly agree with Young's contention that a competent defense lawyer would have handled this case far differently than Garland did.

First, competent counsel would not have gone to trial on an insanity defense without evidence to support it. *Cf. Gaines v. Hopper*, 575 F.2d at 1149 (counsel was not competent where, as the result of his failure to prepare, he was in no better position than his jailed client to evaluate the legal realities of the case or make informed evaluation of potential defenses). The insanity defense in this case amounted to no defense at all, a fact Garland apparently did not recognize until counsel began their final summations to the jury.

Second, competent counsel would have been sufficiently familiar with his client's case to recognize the weak points in the State's cases on both the malice murder and armed robbery charges. *See, e.g., Baty v. Balkcom*, 661 F.2d at 394–95. Competent counsel would have determined that the evidence that Young took Reuben Flynt's life with malice aforethought was extremely thin. To be sure the State had Young's confession, but that confession contained

---

11. We are bound by decisions of the Fifth Circuit Court of Appeals rendered before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

scant evidence of a predisposition to commit murder; and it provided the defense with strong evidence that the homicide was committed in the heat of passion and was not malice murder but manslaughter. Competent counsel would also have realized that there was little doubt that Young drove to Union Point to see Flynt about two bank loans, not to kill him, and that the seeds of the crimes in this case were not planted until, at Flynt's house, Flynt asked Young to return to the bank. Counsel would have argued that this rejection obviously did not sit well with Young because he wanted to dispose of his financial problem then and there, and that Young thought his wife's .22 caliber pistol would be of assistance, so he went to his car to get it. In short, competent counsel would have immediately recognized that there was nothing in Young's confession that indicated that Young intended to use the gun for any purpose other than to force Flynt to discuss the loans. If anything, the confession shows that Young became quite confused as to what to do after he returned to Flynt's house and even attempted to telephone his grandmother for advice. The pistol apparently came into play only when the argument broke out and the struggle ensued. Young used it to subdue Flynt, and he killed Flynt in the process.

It is not within the district court's or our province to say whether on this record Young was guilty of malice murder or some lesser included offense. But it is our duty to determine whether Young received legal representation that passed constitutional muster. In this case, given the evidence the State produced, we have no difficulty at all in concluding that Young's counsel neglected a very strong argument that Young killed Flynt in the heat of passion and thus was guilty, if at all, of voluntary manslaughter. *See* Ga.Code Ann. § 26–1102. At the very least, counsel should have requested a jury instruction on that lesser included offense, since in the absence of such a request the court is not required to give the instruction. *See Jackson v. Georgia*, 239 Ga. 40, 235 S.E.2d 477 (1977).

Turning to the armed robbery count, we note the district court, in assessing the sufficiency of the State's evidence of aggravating circumstances on the malice murder charge, concluded that the State did not produce sufficient evidence to permit the jury to find beyond a reasonable doubt that Young had formed the intent to rob Flynt prior to the fatal assault. *Young v. Zant*, 506 F.Supp. at 280–81. This deficiency in the evidence should have been sufficiently clear to Garland to suggest a strong argument that Young did not rob Flynt by use of an offensive weapon and thus could not be guilty of armed robbery under Ga.Code Ann. § 26–1902.[12]

Garland's failure to adopt the obvious defenses to the State's murder and armed robbery charges and his failure to request a charge on voluntary manslaughter indicates such lack of preparation and exercise of skill that we do not hesitate to conclude that his conduct fell far short of that required of counsel in a criminal trial. *See Kemp v. Leggett*, 635 F.2d at 454. However, Garland's incompetent conduct went even further, for he not only adopted an unsupportable defense to all counts and ignored the obvious defenses to the malice murder and armed robbery charges, he conceded his client's guilt of all three crimes for which he was charged in the guilt phase of the trial; and he did so because of his mistaken belief that such an action was strategically necessary in order to make a strong plea for mercy. Whether, on the facts of this case, such a tactical decision would have been proper under the former Georgia criminal procedure, which Garland still believed to be in effect, we can discern *no* possible reason for this conduct under the present bifurcated procedure. Garland simply failed to inform himself of basic Georgia criminal procedure, a failure that, in this instance, deprived Young of his constitutional right to effective assistance of

---

**12.** Although the petitioner did not raise a claim regarding the sufficiency of the evidence to support his armed robbery conviction, we consider the insufficiency of that evidence in assessing the adequacy of Garland's assistance to Young under the sixth amendment.

counsel in defending all of the charges against him.

The district court's denial of the writ of habeas corpus with respect to the guilt phase of Charlie Young's trial is therefore REVERSED. On receipt of the mandate, the district court shall grant the writ.