**Albert J. CLOZZA, Petitioner–Appellant,**

v.

**Edward W. MURRAY, Director, Virginia Department of Corrections, Respondent–Appellee.**

**No. 89–4009.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1990.

Decided Sept. 13, 1990.

Christopher Matthew Malone, Thompson & McMullan, argued (Stephen A. Northup, Mays & Valentine, Richmond, Va., on brief), Richmond, Va., for petitioner-appellant.

Robert Quentin Harris, Asst. Atty. Gen., argued (Mary Sue Terry, Atty. Gen., on brief), Richmond, Va., for respondent-appellee.

Before WIDENER, HALL and WILKINS, Circuit Judges.

WIDENER, Circuit Judge:

Albert J. Clozza attacks a Virginia state court judgment sentencing him to death. The United States District Court for the Eastern District of Virginia denied his petition for a writ of habeas corpus. We affirm.

Clozza's death sentence was based upon the aggravating circumstance of vileness as well as on the aggravating circumstance of future dangerousness. One of the issues he raises concerns the proportionality review of the Virginia Supreme Court, so the circumstances surrounding the crime are quite pertinent. On Thursday, January 13, 1983, about 6:30 p.m. Patty Bolton, aged 13 years, left her family's residence in the Derby Run Trailer Park to walk alone to a bookmobile that routinely stopped near the Park.[1] She had not returned home by about 8:00 p.m. and her father began searching the neighborhood without success. The police were called about 9:00 p.m., and the father continued searching until later in the evening.

The next morning, the father found a French book on the lawn of his home. He resumed his search and discovered his daughter's T-shirt and a blue notebook, with Clozza's name in it, behind a residence near the Bolton home.

On that day, January 14, a search of the Derby Run area for the missing child was supervised by a Virginia Beach detective.

---

1. These facts are taken from *Clozza v. Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984), and are not in dispute.

Approximately 150 persons, mostly military personnel, participated in the search. Eventually, the search was concentrated in a large field adjacent to the trailer park that separated the park from higher, brush-covered, wooded ground.

About 3:00 p.m., five stacked books were found in the field with one of the child's tennis shoes. Stains from two puddles of blood were discovered near the books. Next, the victim's bra and her other shoe were found farther into the field from the residential area. Then the child's blue jacket, corduroy trousers, underwear, and sock were discovered still farther into the field.

At 4:30 p.m. the child's body, unclothed except for one sock, was found by a member of the search party. The body was lying face down at the bottom of an embankment in the wooded area and was barely visible due to the surrounding brush and undergrowth. The body was encrusted with blood, vegetation-type debris, and mud.

Testimony from the medical examiners described the condition of the body. Externally, the entire front of the face was swollen and bruised. The lips were bruised, torn and crushed. The upper lip had been stripped off the bone. The lower jaw was dislocated. The fat of the cheek was crushed and bruised from the inside.

There were scrapes on the knuckles of the hands and numerous scratch marks on the forearms, buttocks, backs of the thighs, legs, and front of the trunk. These marks apparently were made by bristles and thorns. There was bruising on the front of the knees and dirt driven into the skin. The area around the genitals was bruised. An elongated abrasion was found on the front, inside portion of the left thigh.

Internally, there was bleeding on the surface of the brain and hemorrhage of the scalp. The outer and inner lips of the vagina were bruised. There was a laceration near an area of attachment at the lower end of the inner lips of the vagina. There was tearing and bruising of the lining of the vagina. A piece of twig, three and three-quarters inches in length, had penetrated the vagina, perforated the vaginal wall, and protruded into the abdominal cavity.

Internally in the head and neck region, there was bleeding in the floor of the mouth and the soft tissues of the face. A piece of vegetation resembling a corn husk was wedged in the upper throat.

The medical opinion was that direct blows to the head by a blunt object or a fist caused the extensive injuries in that area. The medical examiner further testified that the twig caused perforation of the abdominal cavity, either at the time of death or just after the victim died. The other vaginal injuries were caused by the penetration of "a firm, cylindrical object, anything from three, four to five, six inches in circumference and penetrating or up to about two or three inches." He opined that the injuries to the knees were consistent with falling down and being pushed down repeatedly. Finally, the medical examiner testified to the cause of death as follows: "She died as a result of shock from bleeding and aspiration of some of the blood; that is, bleeding into the windpipe, swallowing, inhaling the blood into the windpipe and bleeding and shock and hemorrhaging resulting from blunt-force blows about the head and face." She died, he opined, within several hours after eating a meal.

On the evening of the child's disappearance, the defendant, who had worked in the trailer park but lived nearby in the Sandbridge area, was seen in the bookmobile during the period between 6:30 p.m. and 7:30 p.m. About 10:30 p.m. he entered a Seven-Eleven store that was located across the street from the bookmobile. He was "covered in blood." There was blood on his face, arms, and clothes. The fly to his trousers was unzipped. There was blood on the trousers about the opening. He told the store clerk, whom he knew, that he had been "rolled" by two men who had "beat him up." Defendant said that his arm and ribs had been injured in the fight. After helping defendant clean the blood from his person, the clerk called the police. The

defendant left the store before officers arrived.

Clozza was taken into custody by the Virginia Beach Police and the first of a series of interviews with the police began shortly after 8:00 p.m. on Friday, January 14th. Clozza was arrested on a warrant that was executed about 11:30 p.m. that day.

Initially, the defendant denied any involvement with the child. Then, over a period of time, he admitted the crimes with which he was charged except rape. Finally, in an interview that he initiated with the police on June 27, 1983, he admitted raping the victim. The series of confessions reveal the following account of this tragedy.

Clozza had observed the child, who appeared to him to be older than her 13 years, carrying books in the area of the bookmobile. He said he had consumed 15–16 beers earlier in the day but he testified later that he was not intoxicated at the time of the offenses. He stated that he followed her to a point near the front of her residence, "grabbing" her from behind and putting his hand over her mouth and on her arm. He forced her behind a trailer home and told her to remove her coat and shirt. She complied, and he struck her several times. She began to bleed about the mouth. He told her to remain quiet. He forced her to walk through the residential area to the edge of the field. There he ordered her to remove her coat again and her bra. He struck her three times after she followed his directions. He said that she was "[n]ot very badly" injured at that time, but it was "possible" that her teeth had been knocked loose.

Then, they started across the field and after they had walked one-fourth of the way across, the child ran, trying to escape. Clozza caught her, struck her twice while she was standing and forced her to disrobe. She fell to the ground and he hit her three or four times while she was on the ground. He stated he raped her at that point and ejaculated on the ground. He did not remove his clothes but unzipped his trousers. He said her condition then was "fair," but

he thought her nose was broken and that she was "missing" several teeth.

Next, while the child was on the ground, Clozza forced her to commit an act of fellatio on him. Then, he pulled her to her feet and pushed her toward the wooded area. He stated that she was not speaking to him, but that he probably was saying, "isn't this nice or I'm having fun or something on that order."

As they reached a hill where the tree line began, Clozza struck her and made her commit fellatio again. He said her condition was "poor" at that time, she was bleeding from her nose and mouth, and one eye was swollen closed. Next, he "put a stick in her mouth," and another in her vagina. Asked by the interrogator the purpose of placing the stick in her vagina, Clozza answered: "I don't know. Maybe cruelty."

They continued on a path in the wooded area with the defendant striking the child in the back of the head and then in the face. Finally, she fell and, according to Clozza, her condition was "very poor." At this point, Clozza stated, he ordered the child to get up and to go down an embankment. He said that he did not give her an opportunity to comply but that he pushed her "down into the valley" when he saw a light from a flashlight approaching him at a distance. Clozza stated that he left the area, walked back down the path, and went to the Seven–Eleven store.

On November 3, 1983, a jury convicted Clozza of capital murder, aggravated sexual battery, sexual penetration with an inanimate object, abduction with intent to defile, and two counts of forcible sodomy. It fixed his sentence as life imprisonment for each of the non-capital offenses except aggravated sexual battery, and as twenty years imprisonment for the aggravated sexual battery offense. The next day, November 4th, the jury sentenced Clozza to death for capital murder committed during or after rape. The court imposed sentence on November 22, 1983. The Virginia Supreme Court affirmed the convictions of

capital murder and the death sentence.[2] The United States Supreme Court denied his petition for writ of certiorari February 19, 1985.[3]

Clozza filed a petition for a writ of habeas corpus in the Circuit Court of the City of Virginia Beach on April 4, 1985. In its order dated October 25, 1985, that court denied without evidentiary hearing all of Clozza's claims except ineffective assistance of counsel. It held an evidentiary hearing on the ineffective assistance of counsel claim on December 5, 1985, and denied relief on all of Clozza's petition for state habeas corpus relief on June 4, 1986. Clozza then appealed the denial of state habeas corpus relief to the Supreme Court of Virginia. That court affirmed on February 26, 1987. The United States Supreme Court, on November 2, 1987, denied Clozza's petition for writ of certiorari challenging the denial of habeas corpus relief in the state courts.

Clozza filed his petition for federal habeas corpus relief on March 18, 1988. A magistrate, in a lengthy and thorough report filed July 10, 1989, recommended denial of relief. The district court denied relief on August 17, 1989. From that order Clozza appeals.

On appeal, Clozza assigns two grounds of error. First, he claims he was denied adequate and effective assistance of counsel and that such denial violated the sixth and fourteenth amendments of the United States Constitution. Second, he claims that the Virginia capital sentencing procedure is unconstitutional under the fifth, eighth and fourteenth amendments.

Clozza claims ineffective assistance of counsel at both the guilt and sentencing phases of trial. The conduct of his trial counsel was reviewed, after an evidentiary hearing, by the state habeas court. In addition, the claim was also reviewed by the magistrate and the district court. None of those courts found Clozza's trial counsel to be guilty of a lack of reasonably effective assistance under prevailing professional norms. Our own review of the record also indicates the claim lacks merit.

A review of the performance of trial counsel for a criminal defendant begins with *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, a court must evaluate an attorney's performance by the "objective standard of 'reasonably effective assistance' under 'prevailing professional norms.'" *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir.1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985), quoting *Strickland*, 466 U.S. at 687, 688, 104 S.Ct. at 2064, 2065. *Strickland* goes on to say:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). Moreover, even if the defendant shows that trial counsel was deficient,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

---

2. *Clozza v. Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984). The other convictions are not the subject of this case.

3. *Clozza v. Virginia*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. With these standards in mind, we turn to Clozza's claims of ineffective assistance of counsel.

■ Clozza claims his attorney, Legler, made remarks during the trial which prejudiced his case. Such remarks Clozza claims violated his duty of loyalty to his client and constituted unwarranted concessions of guilt, about which Clozza complains in his brief.

During voir dire, the attorney expressed his desire not to participate in the trial and only did so because it was his duty and his job. He also stated that "some team of ACLU lawyers" would decide whether he had gone too far with his instincts in defending Clozza.[4] During the opening statement, he stated that it was difficult "getting to like you [Clozza] enough" to defend him adequately. In addition, he said that he did not know what his defense would be in the case and that he "would probably want to kill"[5] Clozza as a result of the offense. On direct examination of Clozza, his attorney asked him if he knew that it would take such a miracle as would have saved the victim after he left her to save him. His attorney also made the remark that it was "really weird" celebrating Halloween while representing Clozza. During closing argument, his attorney indicated that he did not want to put petitioner "back on the street" and that if Clozza's attempt at suicide had been successful, "it would not have been the greatest tragedy." Clozza argues that his attorney, by making these remarks, conceded Clozza's guilt and breached his duty of loyalty to Clozza. We disagree.

Counsel's remarks must be viewed in light of the facts of Clozza's case and the strategy pursued by counsel. Clozza's attorney faced a task which was difficult at best and which turned out to be impossible. Clozza had confessed to all the charges except capital murder, and to the rape aspect of that.[6] The only defenses that Clozza had available were diminished capacity as a result of intoxication and insufficient evidence to establish rape beyond a reasonable doubt, the highly technical defense of a valid confession being insufficient because of no corroboration. There was evidence which would support an intoxication defense. But there was also evidence to the contrary, and in addition, Clozza's testimony at trial that he was sober during the offense made that defense of little or no value. An equally difficult task which counsel faced was defending on the grounds that there was insufficient evidence to establish rape. Although not contemporaneous with the other confessions, Clozza did confess to the rape.[7] As a re-

---

**4.** This remark was made in the context of a successful challenge for cause of a prospective juror. Not even the juror affected was in the room when the remark was made and even then the court instructed the juror not to talk about what had previously happened with the other jurors. Thus, Clozza's complaint about that remark does not have even arguable merit.

**5.** What the attorney actually said was "If it is my kid, a lawyer training in law school, it wouldn't make any difference. I would probably want to kill him." So the quote out of context in the brief is quite misleading and the complaint probably meritless as is mentioned in note 4 above. Nevertheless we put it with the bulk of the complained of statements. The same reasoning applies to the complaint that the attorney did not seek to put Clozza "back on the street." Clozza had confessed to every charge except capital murder and had no chance of being put "back on the street."

**6.** Initially (on January 18, 1983), Clozza confessed to all the crimes except rape. A tape recording of Clozza's confession was played to the jury during the trial and was admitted as evidence. On June 27, 1983, Clozza made voluntary statements to police admitting that he had raped the victim. The tape of the second confession was also played to the jury. It was admitted into evidence along with a transcript of the tape which Clozza had read and signed. Clozza does not dispute the confessions in this proceeding.

**7.** Clozza challenged the sufficiency of evidence to support the rape conviction in his 28 U.S.C. § 2254 petition. The magistrate found the conviction supported and this conclusion was adopted by the district court. Clozza does not challenge that conclusion here.

In the federal habeas corpus petition lack of penetration was also claimed.

sult, Clozza's attorney faced a strong prosecution case with two weak defenses.

The state court found that,

[h]aving considered all of these aspects, having reviewed it with others, having attended seminars, he [Clozza's attorney] adopted a theory of defense which placed the primary emphasis on the relationship between counsel and the jury and undertaking to make counsel's appearance before the jury credible, and, therefore, hopefully his arguments and expressions before the jury credible.

The strategy to maintain credibility with the jury was reasonable because counsel needed to convince the jury to believe the statements of Clozza's psychiatrists and his earlier statements to the police that he was intoxicated at the time of the offense. At the same time, he needed the jury to discount Clozza's testimony at trial that he was sober. Similarly, counsel needed to undermine the delayed rape confession and satisfy the jury that Clozza's trial testimony to the effect that he did not know whether he committed the crime of rape was the truth.

The remarks which Clozza contends showed hopelessness and disgust indicated to the jury that defense counsel understood the gravity of the crimes as well as their horrible nature. Had counsel attempted to pass the crimes off as anything other than the atrocities that they were, his credibility with the jury would most certainly become suspect. Thus, we conclude that counsel's remarks were consistent with his trial strategy.

In addition, Clozza contends his counsel's remarks conceded guilt. We disagree. Clozza refers the court to *Young v. Zant*, 677 F.2d 792 (11th Cir.1982), *cert. denied*, 464 U.S. 1057, 104 S.Ct. 740, 79 L.Ed.2d 198 (1984); *Francis v. Spraggins*, 720 F.2d 1190 (11th Cir.1983), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); and *People v. Redmond*, 50 Ill.2d 313, 278 N.E.2d 766 (1972), for the proposition that a criminal defendant can be deprived of effective assistance of counsel by unwarranted concessions of guilt. While that may be true in a proper case, those cases are distinguishable from the case at bar because on such different facts as to be unpersuasive. *Francis* involved defense counsel conceding guilt in closing argument in a capital murder case and suggesting life imprisonment. He stated, "I think he committed the crime of murder." *Francis*, 720 F.2d at 1193 n. 7. The guilt was conceded in spite of the fact that the defendant had pleaded not guilty, had taken the stand and in testimony denied any knowledge of participation in the offense. *Francis*, 720 F.2d at 1193. In *Young*, the defense attorney did not understand the bifurcated trial procedure and acted under the mistaken belief that conceding guilt to the crimes charged was strategically necessary to making a strong plea for mercy, and that such a plea was appropriate at the guilt phase of trial. *Young*, 677 F.2d at 799. In addition, he chose to pursue an unsupportable insanity defense and neglected to pursue other defenses. *Young*, 677 F.2d at 798–99. Finally, *Redmond* involved defense counsel admitting guilt of murder even though the defendant's testimony suggested an accidental shooting and did not admit or imply guilt. The attorney stated in closing argument: "Guilty, yes. Sure, guilty." *Redmond*, 278 N.E.2d at 768. So it is at once apparent that none of these cases justify a finding of incompetent counsel here.

Additionally, there is a distinction which can and must be drawn between a statement or remark which amounts to a tactical retreat and one which has been called a complete surrender. While "complete concession of the defendant's guilt" may constitute ineffective assistance of counsel, *Francis*, 720 F.2d at 1194, the Eleventh Circuit's analysis of a case tried on facts remarkably similar to those here, *Messer v. Kemp*, 760 F.2d 1080 (11th Cir. 1985), *cert. denied*, 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986), accurately states our conclusion in the present case. The court stated there: "If guilt were to some degree implied in what Sawhill [the attorney] said, it was a weak implication at best, and arguably unavoidable in light of the overwhelming evidence and stated trial

strategy." *Messer*, 760 F.2d at 1090. The same can be said of the remarks Clozza's counsel made here. The remarks enhanced counsel's trial strategy. Given that these remarks were largely attributable to trial strategy, we cannot, in keeping with *Strickland*, second-guess counsel's tactical choices.

The state court found that some of the statements made by Legler did not further the trial strategy and were not necessary. But putting those statements in the context of the entire trial, the court noted that these statements were but "one or two or perhaps three" during a trial that went on several days. The court went on to find that "there was not, in the total picture, a deficient performance by counsel for the defendant."

While the historical findings of fact are presumed to be correct under 28 U.S.C. § 2254(d), the conclusion of the state court that the attorney was not ineffective is a mixed question of law and fact not subject to the presumption of correctness. *Strickland v. Washington*, 466 U.S. at 698, 104 S.Ct. at 2070. So far as the state court's findings of historical fact bear on the question, they are presumed to be correct under the statute, and we find no evidence of any consequence in the record to contradict them, so we consider them to be correct. On the question of whether the attorney's performance was ineffective, we are in agreement with the state court that it was not. We reach this conclusion, however, without reference or help from any presumption contained in § 2254(d).

The attorney here, for example, in the most critical part of his case, indeed the only part as to which there was even an arguable defense, was faced with what amounted to a hopeless contradiction. The only two defenses with any color at all were to capital murder. They were that Clozza had drunk enough beer to be intoxicated and, thus, have a lack of premeditation. The second was insufficient evidence on the charge of rape based largely on a claimed lack of corroboration of Clozza's confession of the same. So the attorney, it is now claimed, at the same time, was supposed to convince the jury to believe Clozza's trial testimony that he did not remember raping the little girl, as opposed to his confession which said that he did, and, at the same time, get the jury to accept Clozza's confession that he was drunk and reject his trial testimony that he was sober. That this dilemma was present in full force had been apparent, of course, at least from the moment Clozza testified, for he had advised his attorney for months on end that he was drunk during the incident. The bright line rules and standard operating procedures now suggested by Clozza's attorneys in criticism of Legler simply will not withstand even casual analysis. The dilemma was upon him, and almost anything other than an open confession of complete guilt should withstand an ineffectiveness claim. This the attorney did not do. He argued the intoxication and lack of evidence defense in the guilt stage as best he could. To say that he had even a remote chance of success is simply to contest the inevitable. Clozza had confessed to every crime with which he was charged except capital murder, and he had confessed to the rape aspect of that crime. Each aspect of his confessions was corroborated, and the circumstances, even to the brand of cigarettes he smoked and to a notebook belonging to him found at the scene of the crime. To reasonably expect his attorney to extricate Clozza from this dilemma is simply not realistic.

 The state court, concerned that others might disagree with its conclusion that counsel was not deficient, went on to address the second prong of *Strickland*—whether, in light of the comments, such prejudice resulted to the defendant as would require a court to determine that there is a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. We also have analyzed this second requirement and conclude that no prejudice resulted from counsel's comments.

According to *Strickland*, there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been differ-

ent." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We note once again that the evidence against Clozza was overpowering. Defense counsel was faced with confessions to the crimes by his client as well as evidence linking Clozza to the crimes. Abundant support for the conviction found in the record reduces the likelihood that error affected the verdict which was returned. See *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. The state court concluded "that it is impossible ... to see that those comments prejudiced the defense," a finding not subject to a presumption of correctness, but with which we agree on independent analysis.

A part of that which immediately follows will be repetitious, but the subject is generally the same. As previously noted, Clozza's two defenses, intoxication and insufficient evidence to support the rape charge, were both weak. The support for the intoxication defense was inconsistent. Despite the weak nature of the defense, it was pursued by counsel as best he could. Similarly, the defense that there was insufficient evidence to support the crime of rape was also a weak defense. Although Clozza confessed to the crime five months after he had confessed to the other crimes, the confession was nonetheless voluntary, intelligent and fully corroborated. Given the confession, it is difficult to imagine the jury being persuaded by Clozza's statement at trial that he could not remember whether he committed the offense. This is especially true in light of the fact that Clozza testified on the stand that he was sober during the offense.

In light of the abundant evidence to support the verdict and inconsistent evidence to support the defenses available, we cannot conclude that the result of these proceedings would have been different had counsel not made the questioned remarks. Therefore, we conclude that Clozza has not satisfied either prong of the *Strickland* analysis with regard to counsel's comments.

■ Additionally, Clozza claims that his trial counsel failed to adequately prepare him for direct and cross-examination.

Clozza claims that the direct examination conducted by his attorney amounted to nothing more than an attack. We have previously reviewed the remarks counsel made during direct examination and have already disposed of the claim that they amounted to ineffective assistance of counsel. We now turn to the contention that counsel was ineffective because he did not prepare Clozza for cross-examination.

The substance of Clozza's claim with regard to the cross-examination is that, at this point in the trial, Clozza refuted his previous statements that he was drunk at the time of the offense and stated that he was sober during the offense. The questions and answers follow:

Q. Were you drunk when you went into the Seven–Eleven?

A. No, Sir.

Q. Were you drunk when you abducted Patty?

A. I don't believe so.

Q. So you were perfectly sober during all of this?

A. Yes, Sir.

Clozza claims that counsel erred by not preparing him for such cross-examination. Counsel, however, stated at the state habeas proceeding that he does not normally prepare clients for cross-examination, believing with reason that a witness who is not lying will not be tripped up. For nine months, Clozza had told his attorney that he was drunk during the offense, but changed his story on the stand with no forewarning. If indeed it was the truth that he was sober, no amount of preparation would have changed the answer. How the attorney should have prepared Clozza short of instructing him to lie is not suggested even now, and we know of no satisfactory explanation. Thus, we cannot conclude Clozza was represented by ineffective counsel at the guilt phase of the trial.

■ Clozza next argues that he was represented by ineffective counsel at the sentencing phase, which claim is also reviewed under the two part *Strickland* analysis. Initially, Clozza contends that his counsel was ineffective because he did not adequately prepare for this stage of the pro-

ceeding. The claim is both general and particular. The general aspect concerns general preparation, and the particular aspect almost wholly the fact that Clozza's parents and Dr. Lee were not recalled as witnesses although they had testified in the guilt stage of the proceeding.

We note at the outset that the time and effort Legler spent in the guilt phase of the trial is relevant to preparation for sentencing so far as the same is useful for the sentencing phase as much of this was. See *Darden v. Wainwright,* 477 U.S. 168, 184–85, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986). In the beginning, counsel met with and spent time with Clozza to determine Clozza's version of the facts as well as to discover the details of the confessions. He talked to witnesses who saw Clozza on the night of the crime and also visited the crime scene. His investigator talked with a probation officer in Michigan about Clozza's prior conviction for attempted criminal sexual conduct and his presentence report was obtained for the Michigan offenses. Clozza was on parole at the moment and his supervising Virginia Beach parole officer was also talked to.

Although he was the most experienced criminal defense attorney in Virginia Beach, this was Legler's first capital case, for no capital case had been tried in Virginia Beach for several years. In preparation, Legler spoke with other defense attorneys who had experience in capital cases. He also talked with police personnel involved in Clozza's case and members of the Commonwealth Attorney's office to determine what information the police had. He read and studied the statutes and procedures involved as well as publications on the subject of capital cases. In order to determine if any psychiatric defenses were available, counsel had Clozza examined by a psychiatrist from the University of Virginia Institute of Law and Psychiatry, as well as those from Central State Hospital who were employed by the Commonwealth.

With regard to the sentencing phase and possible mitigating evidence, Legler spoke with two doctors from Central State Hospital as well as Clozza's parents. Counsel met with one of the two doctors, Dr. Lee, before trial to discuss Clozza's condition. Dr. Lee testified he was aware of mitigating factors found in the Virginia statutes and informed counsel of intoxication as a possible mitigating factor. Counsel also talked with Clozza's parents before sentencing and told them their testimony was needed. Thus, it is patent in the papers before us that Legler did prepare for both phases of Clozza's trial. Basically, Legler was able to introduce at the guilt phase all the mitigating evidence he could have introduced at the penalty phase.

■ The fact that Dr. Lee was not recalled to testify at the sentencing hearing deserves a word. His testimony at sentencing would have added nothing new. He testified at the guilt phase and during the state habeas corpus proceeding and indicated that his testimony at sentencing would not have been different. Indeed, if he had testified, he may have done more harm than good because he would have been subject to an additional cross-examination. Part of the doctor's testimony was based on the concept that Clozza was intoxicated at the time of the offense. The credibility of the doctor would have immediately become suspect when this fact came to light because, as we have previously noted, during the guilt phase, Clozza testified that he was sober during the offense. Indeed, the doctor admitted during the state habeas proceeding, "if he was, indeed, sober, it would, of course, indicate my reconstructions would be false." Dr. Lee's alternate diagnosis was that Clozza "could have been pathologically oriented or psychopathically oriented." Legler, speaking of this alternate theory, stated, "[w]ell that certainly didn't help." An additional danger that the Commonwealth could have pursued on cross-examination of Dr. Lee was Clozza's prior conviction in Michigan of attempted criminal sexual conduct.[8]

**8.** Clozza apparently had been charged in Michigan with two sex-related offenses and the Commonwealth had one of the Michigan prosecutrices available to testify but the court, at Legler's instance, did not admit the testimony.

Keeping in mind the potential damage presented by Dr. Lee's testimony, as well as the limited benefit the testimony could provide, we conclude that counsel's decision not to call Dr. Lee during the sentencing phase of the trial was a reasonable tactical choice. Indeed, on the record as we have it, any other choice would have been more subject to collateral attack than the choice made.

■ Clozza also claims error because his parents did not testify at the sentencing hearing. Legler, however, discussed the sentencing phase of the trial with Clozza's parents and requested that they testify. He told them that their son faced the death penalty and that he wanted them to testify. Clozza argues that his attorney erred because "he never explained to the parents the nature of the sentencing phase and the role that their testimony could play as mitigating evidence in that phase of the trial." His parents testified that Legler never asked them to stay for sentencing. The state habeas court found that Legler's testimony was more credible. We find it inconceivable that Clozza's parents did not recognize the importance of this phase of the trial. They knew of the crimes their son committed and the possible punishment. Their decision to return home and not testify at this stage of the trial did not result from a lack of effort on the part of the attorney. Thus, the failure to introduce the testimony of Clozza's parents at the sentencing phase did not result from a lack of effort on the part of counsel.

■ We note that much of the testimony Clozza claims should have been brought out at sentencing was brought out during the guilt phase of the trial. For instance, Dr. Lee, as well as Clozza's parents, testified during the guilt phase of the trial. The state court concluded:

> [I]f there was error in [the] failure to call Doctor Lee or in [the] failure to call Mr. and Mrs. Clozza during the course of the sentencing phase, it is impossible in the mind of the Court to see this in anywise prejudices the defense.

Having examined the evidence Clozza contends should have been submitted, we are not left with the conclusion that there is a reasonable probability the result would have been different if the evidence had been presented. Even if counsel were ineffective, which we do not suggest, we are of opinion there was no prejudice resulting to Clozza's case as a result of Legler's conduct.

■ Clozza also argues that his attorney was constitutionally ineffective because he offered no instructions with reference to mitigation of the sentence in the penalty phase of the trial. Clozza does not suggest, however, any appropriate instruction which might have been offered. The Court has discussed this matter in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) and stated: "As we have discussed, see *supra*, at 873–880, 103 S.Ct. at 2740–2744, the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances, and Georgia has not adopted such a system." *Id.* at 890, 103 S.Ct. at 2749. The discussion referred to at pages 873–80, 103 S.Ct. at pages 2740–44 of *Zant* goes into the fact that in Georgia the "jury is not instructed to give any special weight to any aggravating circumstance, to consider multiple aggravating circumstances any more significant than a single such circumstance, or to balance aggravating against mitigating circumstances pursuant to any special standard." *Zant*, 462 U.S. at 873–74, 103 S.Ct. at 2740–41. The Court concluded its detailed discussion with the conclusion that the absence of legislative or court-imposed standards to govern the jury in weighing the significance of either or both of the aggravating circumstances mentioned did not render the statute invalid as applied. *Zant*, 462 U.S. at 880, 103 S.Ct. at 2744. The quoted portion of *Zant*, from pages 873–74, 103 S.Ct. pages 2740–41 thereof, very well describes what took place in this case. Since it has been decided, *Zant*, 462 U.S. at 880–90, 103 S.Ct. at 2744–49, that there is no constitutional duty to adopt specific standards for instructing juries or to weighing mitigating and aggravating circumstances, there can

be no constitutional error in not complying with it. In all events, the jury was instructed by the trial court that they were entitled to look at all the evidence presented during the whole trial in determining whether to impose the death penalty; that they must sentence Clozza to life imprisonment if the evidence did not justify death, and in the form of the verdict, it was expressly stated that "[w]e, the jury, ... having considered the evidence in mitigation of the offense, unanimously fix his punishment at death." We are of opinion that the attorney was not constitutionally ineffective in not offering any further instructions with reference to mitigation of the sentence.

■ Clozza's last claim of error is that Virginia's capital sentencing procedure is unconstitutional on its face and as applied under the fifth, eighth and fourteenth amendments to the Constitution. The district court held that this claim was procedurally barred and Clozza "acknowledges that under existing law he is barred from asserting this claim unless he can establish cause for the failure to raise the claim at trial and on direct appeal and prejudice as a result of the failure." (Clozza brief, pp. 45–46.) With that analysis and acknowledgement we agree.

The existence of cause, as Clozza acknowledges, for procedural default must ordinarily turn on whether he can show some objective factor external to the defense which has impeded his attorney's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). And, under appropriate circumstances, ineffective assistance of counsel may be cause for procedural default. *Murray*, 477 U.S. at 488, 106 S.Ct. at 2645. Also, the novelty of a claim has been held to constitute cause. *Reed v. Ross*, 468 U.S. 1, 12–16, 104 S.Ct. 2901, 2908–10, 82 L.Ed.2d 1 (1984).

Clozza does not claim the existence of any objective factor external to his defense, leaving ineffectiveness of counsel and novelty as his claims.

His complete claim with respect to ineffectiveness is that "[a]s demonstrated above [in the preceding pages of the brief], Mr. Legler's ineffectiveness permeated petitioner's entire trial, infecting both the guilt determination and sentencing phases with Mr. Legler's prejudicial remarks and comments and the sentencing phase with Mr. Legler's complete failure to prepare or present a case in mitigation." The claim is then stated that "[u]nder these circumstances, it is appropriate to conclude that the same ineffectiveness caused Mr. Legler not to assert the constitutional challenge to Virginia's capital sentencing procedure which petitioner asserts here." (Clozza brief, p. 46.)

The ineffectiveness of counsel claim is without merit for two reasons. First, we have rejected earlier in this opinion the claim that Legler was an ineffective attorney. Second, no part of the ineffectiveness claimed against Legler has any relation to the fact that the claim now asserted was not raised and is so subject to procedural default. The fact an attorney may have been ineffective at one stage in the proceedings, or in one aspect thereof, does not indicate ineffectiveness in any other context, which is the claim here. Even if there are most extraordinary circumstances in which ineffectiveness in one aspect would carry over to another, a subject on which we express no opinion, such are certainly not present in this case, and Clozza's claim must be rejected for the second reason with as much force as for the first given.

Similarly, Clozza's claim of novelty of the issues is stated with brevity and in conclusory terms. The entire statement of his position follows:

Alternately, the novelty of the claim petitioner asserts here constitutes cause for Mr. Legler's failure to assert the claim. As of the time of petitioners' trial and appeal, no case had questioned the constitutionality of Virginia's capital sentencing procedure on the grounds petitioner asserts here. Even as of today, no case has yet overturned a capital sentencing procedure on the precise grounds asserted by these [sic] petitioner, although, as demonstrated above, Virgi-

nia's capital sentencing procedure is constitutionally defective on these grounds. No case is cited to support the position claimed. Neither is any other fact cited to support the same. The Commonwealth's response is similarly terse and is to the effect that the claims are not novel, and we agree.

Nevertheless, only because of the gravity of the case, a brief discussion of the reasoning underlying the claims is not out of order.

Clozza claims that the Virginia vileness statute is so vague and subjective as to be invalid under *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). We first note that that matter was raised in *Godfrey* at the latest by 1980, and in the Supreme Court of Virginia in *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978). We have also held a similar contention to be without merit in *Briley v. Bass*, 750 F.2d 1238 (4th Cir.1984). So the claim is not only not novel, it is also without merit.

■ Clozza argues that the use of the words "and/or" in the verdict form may have deprived him of an unanimous verdict on either the vileness or dangerousness aspect of the case. The claim was not asserted at trial, or on direct appeal, or in the Virginia habeas corpus proceedings filed April 4, 1985, or in the federal habeas corpus petition. It was raised for the first time in opposition to the motion to dismiss the federal habeas corpus petition. So the claim is procedurally defaulted, *Whitley v. Bair*, 802 F.2d 1487 (4th Cir.1986), and whatever novelty the claim had certainly vanished with *Turner*, decided January 25, 1985, or really with *Briley v. Bass*, 750 F.2d 1238 (4th Cir.1984), decided a month previously. Not only is the claim procedurally defaulted, the verdict is without constitutional error. In *Turner v. Bass*, 753 F.2d 342 (4th Cir.1985), we upheld, over a constitutional objection, a jury verdict in the same form against a similar challenge. Not only has the form of the verdict been upheld in *Turner*, the Virginia Supreme Court in this very case found that the death sentence was "based on both the vile

nature of the offense and the likelihood that the defendant would commit future acts of violence that would constitute a serious threat to society." *Clozza*, 321 S.E.2d at 282. So both the vileness and dangerousness aspects of the case have been decided adversely to Clozza.

■ Clozza's next argument is that Virginia's death penalty scheme is invalid for failure to instruct the jury on statutory mitigating factors mentioned in Virginia Code § 19.2–264.4. That question has been previously disposed of in this opinion by our discussion of the claim that the attorney was constitutionally ineffective for not offering such instructions. We have relied on *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), in this same opinion for our decision as to the similar ineffectiveness claim, and rely on *Zant* in this context also, for the claims are, in fact, the same.

■ Clozza's last claim is that the scope of proportionality review of the Virginia death sentencing statute, Virginia Code § 17–110.1, is invalid under the eighth and fourteenth amendments because the Virginia Supreme Court compares the record in all capital murder cases reviewed by that court and does not compare the record in which Clozza calls "comparable cases in which the death penalty was not imposed." While we doubt that the claim has even colorable merit as facially stated, we need not decide the question because the Virginia Supreme Court, in considering the proportionality review, decided that this case is the worst on record. The Court decided: "Actually, there are no other cases in our records that have involved conduct as despicable as the acts of this defendant." In view of that holding, we need go no further. *Clozza*, 321 S.E.2d at 282.

The judgment of the district court is accordingly

AFFIRMED.